FILED
2014 Mar-31  AM 09:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **WONDA ENNIS,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **2:11-cv-03502-JHH** |
| **TYSON FOODS, INC.,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

The court has before it the Motion (Doc. #29) for Summary Judgment filed by Defendant Tyson Foods, Inc. ("Tyson") on July 5, 2013.  Pursuant to the court's orders of July 9, 2013 (Doc. #33), July 15, 2013 (Doc. #35), and September 6, 2013 (Doc. #40), the motion for summary judgment is now under submission and is considered herein without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that Tyson's motion for summary judgment is due to be granted for the reasons outlined below.

## I.    <u>Procedural History</u>

Plaintiff Wonda Ennis commenced this action on September 28, 2011 by filing a two count complaint in this court alleging: (1) violation of the Americans with

Disabilities Act, as amended, and the Americans with Disabilities Amendments Act ("ADAAA") (Count One) and (2) violation of the Age Discrimination in Employment Act ("ADEA") (Count Two). Specifically, Plaintiff asserts in her complaint that she was subjected to discrimination and that her employment was terminated because of her age and/or disability.

Defendant's July 5, 2013 Motion (Doc. #29) for Summary Judgment asserts that no genuine issue of material fact exists and that Tyson is entitled to judgment as a matter of law as to all claims asserted against it.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment. On July 5, 2013, Tyson submitted evidence[1] (Doc. #30, Exhs. 1-11; Doc. #31, Exhs. 12-22) in support of the motion and also filed a supporting memorandum brief (Doc. #32). Plaintiff submitted evidence[2] (Doc. #36, Exhs. 1-28) in opposition to the motion for

---

[1] Defendant Tyson submitted: the sworn deposition of Wonda Ennis, with exhibits (Exhibit 1); the sworn deposition of Jan Casey, with partial exhibits (Exhibit 2); the sworn deposition of Vivian Chang (Exhibit 3); the sworn deposition of Brenda Trujillo, with partial exhibits (Exhibit 4); the sworn deposition of Jason White, with exhibits (Exhibit 5); the sworn deposition of Brandy Woods (Exhibit 6); the sworn declaration of Jan Casey, with exhibits (Exhibit 7); and the sworn declaration of Vivian Chang, with exhibits (Exhibit 8).

[2] Plaintiff submitted in support of her opposition to summary judgment: Vicky Craig deposition (Exhibit 1); disciplinary action form 9/28/09 (Exhibit 2); disciplinary action form 12/11/09 (Exhibit 3); disciplinary action form 1/7/10 (Exhibit 4); disciplinary action form 1/28/10 (Exhibit 5); disciplinary memo 1/28/10 (Exhibit 6); Ennis email to White 12/28/09 (Exhibit 7); White memo to Ennis 1/15/10 (Exhibit 8); Ennis evaluation 2007-2008 (Exhibit 9); Ennis evaluation 2008-2009 (Exhibit 10); White disciplinary form 11/12/10 (Exhibit 11); White disciplinary form

summary judgment on August 20, 2013 and on the same date filed an opposing brief (Doc. #37).   On August 28, 2013, Tyson filed a reply (Doc. #38) to Plaintiff's response in opposition to Defendant's motion for summary judgment.

On September 6, 2013, the court granted Plaintiff's motion for leave to file a sur-reply brief.  (Doc. #40).  That sur-reply brief (Doc. #41) was filed on September 11, 2013 and Tyson's response (Doc. #42) to the sur-reply was filed on September 16, 2013.[3]

## II.   <u>Legal Standards for Evaluating a Summary Judgment Motion</u>[4]

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

(Exhibit 12); Brandy Woods disciplinary form 4/4/11 (Exhibit 13); Woods' signed rules of conduct 4/24/06 (Exhibit 14); Tyson timeline for Woods 3/28/11 (Exhibit 15); Chang email to White 4/1/11 (Exhibit 16); summary exhibit of Woods documentation (Exhibit 17); summary exhibit of emails re: woods (Exhibit 18); White salary increase request 10/27/11 (Exhibit 19); Kirk email to Casey 3/17/11 (Exhibit 20); Phillips email to Casey 3/28/11 (Exhibit 21); Ennis EEOC charge 4/20/10 (Exhibit 23 * Exhibit 22 was skipped in the original filing*); Tyson Response to EEOC charge 1/5/11 (Exhibit 24); DIR Decision 4/9/10 (Exhibit 25); White email to Chang 1/7/10 (Exhibit 26); White email to Casey 12/21/10 (Exhibit 27); and Tyson Rules of Conduct (Exhibit 28).

[3] The sur-reply in further opposition to the motion for summary judgment primarily asserts these arguments: (1) that Facebook messages cited by Tyson in its reply brief are not admissible; (2) that the replacement argument made by Tyson should not be considered; (3) that Tyson accuses Plaintiff of misstating the progressive discipline policy; (4) that the reasons for Ennis's termination are suspect; and (5) that White had some limited involvement in the discipline of Brandy Woods. (*See generally* Doc. #41).  To the extent that it is relevant to the analysis herein, the sur-reply is considered along with Tyson's response to the sur-reply.  (Doc. #42).

[4]  Federal Rule of Civil Procedure 56 was amended on December 1, 2010.  However, even with the 2010 amendments, "the standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56 Advisory Committee's Note (2010 Amendments).

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge her

4

initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, she can satisfy her initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving

5

party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets her initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   <u>Relevant Undisputed Facts</u>[5]

### A.   **Background of Plaintiff's Employment at Tyson**

---

[5] If the facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick*, 2 F.3d at 1115.

Plaintiff Wonda Ennis started working for Tyson at its Blountsville plant, a chicken processing facility, as a production worker in the Evisceration Department in 1992. (Pl. Dep. at 57-58). Ennis worked in various production jobs until she was promoted to Management Support QA Technical ("QA Tech"). (Pl. Dep. at 58). In July of 2006, Ennis was promoted to the position of QA supervisor. (Pl. Dep. at 60). While Plaintiff was a QA Tech and when promoted to QA supervisor, she reported to Brenda Trujillo. (Pl. Dep. at 61, 63).

The QA Department is tasked with managing a program of product checks and analyses in order to meet the quality and safety standards of Tyson's customers. QA Techs collect data and perform checks on product specifications such as marination, net weights, piece counts, etc. (Pl. Dep. at 59). QA Clerks write reports, file documents, perform quality checks, and work in the QA lab. (Pl. Dep. at 59). QA Supervisors are tasked with monitoring and maintaining QA programs that verify that product specifications are met and with ensuring compliance with applicable regulatory requirements. (Pl. Dep. at 77).

QA Supervisors report directly to the Plant QA Manager, who reports up through a corporate QA chain of command. (Pl. Dep. at 82). The QA Department reports up through corporate QA instead of plant management to reduce any possible conflict of interest between production at the plant and Quality Assurance. (Pl. Dep.

at 82).

B.      **Plaintiff's Employment in QA**

When Ennis began working in QA Tech, she had to learn to perform various QA functions on the computer.  (Pl. Dep. at 78).  As a QA Clerk, Ennis taught herself how to use the forms and reports, and experienced no problems with her ability to learn those functions on the computer.  (Pl. Dep. at 79).  Ennis felt confident in her abilities as a QA Clerk on the computer.  (Pl. Dep. at 89).

When Ennis was promoted to QA Supervisor in July 2006, she was 55 years old.  (Pl. Dep. at 100).  She went from working the first shift to working the second shift, and managed employees that she had not been working with as a co-employee prior to the promotion.  (Pl. Dep. at 101-102).  In addition, Ennis was tasked with monitoring and maintaining all aspects of the entire QA program on her shift, which called for a new level of responsibility.  In this regard, Ennis understood that she was going to learn a lot of new skills, and that the QA Supervisor position had a significantly increased level of responsibility than her prior QA Tech and Clerk positions.  (Pl. Dep. at 103).  Ennis admits that she had some challenges transitioning and learning her new QA Supervisor duties.  (Pl. Dep. at 105).

During Plaintiff's employment as a QA clerk and for three years of her position as a QA Supervisor, supervisor Brenda Trujillo evaluated her performance five times.

8

(Trujillo Dep. at 264).   In all of those evaluations, Ennis was rated as meeting expectations, including those evaluations while Plaintiff was in the role of QA Supervisor.  (Trujillo Dep. at 264).  With the September 2008 evaluation, however, Trujillo set new goals for Ennis to accomplish in 2009 – specifically, for Ennis to become "proficient in the Plant View system."  (Exh. 18 to Pl. Dep.).  To become proficient, Trujillo wrote: "This will be accomplished by practicing in the system and using knowledge obtained in the Plant View Administration class.  This will be verified by tests entered, QA data verification, and timely responses to requests for items added."  (Exh. 18 to Pl. Dep.).  In March 2009, Tyson sent Ennis to Arkansas for the Plant View Administration Class, the same two days of training that Trujillo attended.  (Pl. Dep. at 163).

### C.    The Working Relationship of Trujillo and Ennis

In or around October 2008 (almost immediately after the September 2008 evaluation), the QA Department in Blountsville started having problems performing QA functions satisfactorily.  (Pl. Dep. at 115).  During this time, Trujillo took issue with Ennis's work performance.  (Pl. Dep. at 135).  In addition, Trujillo was not getting along with many employees in the QA Department.  (Pl. Dep. at 115-116).  Ennis complained to Human Resources about Trujillo, specifically stating that "Brenda [Trujillo] . . . talks down to me and really all of us."  (Pl. Dep. at 136).  Ennis

understood that Trujillo was issued a written warning as a result of the investigation conducted by HR after Ennis's complaint. (Pl. Dep. at 142). Ennis was satisfied with the outcome of the investigation and never reported back to HR of any continuing problems with Trujillo. (Pl. Dep. at 143).

In November 2008, Trujillo documented a counseling session with Ennis regarding her failure to sign off on Hazardous Analysis Critical Control Points ("HACCP") paperwork as required. (Exh. 19 to Pl. Dep.). The required daily paperwork had not been done for two days. (Exh. 19 to Pl. Dep.). This QA check was critical to avoiding any problems with product that had already shipped from the plant. (Exh. 19 to Pl. Dep.).

Trujillo continued to document performance issues with Ennis. In March 2009, Trujillo met with Ennis and counseled her on not answering emails; not following up on customer requirements (instances where data was not recorded by Ennis's QA Techs, instances where Ennis had given QA Techs permission to skip checks required by customers, and an occasion where Ennis waited two weeks to respond to a request from a customer for data and did not send the data until a second request was received from the customer); not responding to requests for information/data needed for audits (having to be asked three times for chiller dwells and temperatures before sending them, not completing the Foreign Material summary until Trujillo asked for it twice);

and not organizing and informing QA Techs about their schedules.  (Exh. 20 to Pl. Dep.).  Trujillo reminded Ennis that the Blountsville plant was "becoming a plant in the spotlight due to the new customer base we have attained.  We, as a department, need to make sure all details of our duties are carried out.  Attention to details and communication is of the utmost importance." (Exh. 20 to Pl. Dep.).  Ennis signed the memo to file and described the documents as "just a reminder from [her] boss that [her] department was a mess."  (Exh. 20 to Pl. Dep.; Pl. Dep. at 454-455).

Trujillo's employment at Tyson was terminated in June 2009 when she received four written warnings in a 12 month time period, including write-ups for job performance.  (Pl. Dep. at 173).  One incident requiring Trujillo's write-up related to a racist symbol in the workplace that Trujillo failed to report.  (Trujillo Dep. at 100-104; Casey Dep. at 239).

### D.    Interim Manager Tammy Cannon

During the interim time between Trujillo's departure and the hiring of a new QA Manager, a QA Manager from the Albertville plant, Tammy Cannon, filled in at the Blountsville plant.  (Pl. Dep. at 52).  Ennis had some performance issues under Cannon's supervision.  On July 16, 2009, Cannon issued Plaintiff a counseling statement for not putting product on hold after being instructed to do so by USDA. (Exh. 21 to Pl. Dep.).

11

In July 2009, Ennis had an anxiety attack at work and had to leave early.  On July 14, 2009, Ennis was returned to work by her doctor, Dr. Lennie Gibson.  (Casey Decl., ¶ 11).  Dr. Gibson stated on the Return to Work Certification that Ennis suffered from "anxiety nervosis longstanding use of Ativan.  Had depression, excessive perspiration, chronic fatigue, no energy." (Casey Decl., ¶ 11).  He further stated there was "no reason [Ennis] can't continue her job." (Casey Decl., ¶ 11).  Dr. Gibson returned Plaintiff to work full duty with no request for accommodation. (Casey Decl., ¶ 11).

On July 17, 2009, Jan Casey, then Blountsville Plant HR Manager, requested permission to "double slot" the second shift QA Supervisor position (Ennis's position).  (PX 26).  Casey requested authority to hire a second QA Supervisor, Matthew Crowe, to work temporarily on the second shift with Ennis to help get things caught up in the QA Department after Trujillo's departure. (PX 26). Casey explained to Ennis that Crowe was hired temporarily to help get the QA Department in order and to assist Ennis in completing the second shift QA work.  (PX 26).  However, Ennis testified that Crowe never helped her perform her job functions and that Crowe was hired only because the department in general was so far behind.  (Pl. Dep. at 227).

### E.   White is Hired as Manager

Jason White was hired as QA Manager and began working at the plant on August 2, 2009.  (PX 26).  Prior to White accepting the job as QA Manager in Blountsville, he visited the plant and conducted an internal audit in order to assess the status of the QA Department.  (Pl. Dep. at 219).  The audit was White's first impression of the QA Department.  Ennis testified that the documents and data needed for the audit "wasn't really good at all" and that the department failed the audit.  (Pl. Dep. at 219).  Plaintiff described the QA Department and the audit as "a mess."  (Pl. Dep. at 223).  Ennis expected that her new manager would implement new ways of doing things in the QA Department, especially since there were many things that needed to be improved.  (Pl. Dep. at 223-224).

On August 13, 2009, Ennis was unable to respond to a request for data on a customer complaint, because the QA Techs on her shift were performing "cook offs" and she had told them not to worry about performing checks.  (PX 26).  As such, there was no QA data for a response to the customer.  (PX 26).  White did not issue any written discipline to Ennis for this performance issue.

On the same day, August 13, 2009, Vivian Chang, Food Safety QA Division Manager for Tyson Foods (and White's direct supervisor), emailed White regarding a customer issue from Wendy's.  (PX 26).  White forwarded the inquiry to Ennis who

responded to Chang's questions. (PX 26). Chang emailed Ennis almost immediately, with questions regarding an attached report. (PX 26). After receiving no response, Chang emailed Ennis again three hours later seeking the response and finally emailed White to get the answer needed. (PX 26). White did not issue any written discipline to Ennis for this performance issue. (PX 26).

On August 18, 2009, White met with Ennis about an issue with an hourly worker in QA who complained about Ennis to HR. (PX 26). The worker had complained that Ennis was unprofessional and accusatory. (PX 26). The HR investigation revealed that the hourly worker had indeed been late for work many times, but that Ennis had failed to take the proper disciplinary action. (PX 26). In fact, based on time records, had Ennis been following policy with regard to issuing attendance points, the employee would have no longer been eligible to work in the QA Department. (PX 26). White spoke to Ennis about being professional and issuing attendance points as required when her employees were late to work, but again did not issue any written discipline to Ennis.

On August 31, 2009, White memorialized several issues he had with Ennis's performance in an email to Chang, seeking guidance on addressing the issues with Ennis:

14

- I asked Wonda to go ahead and issue a written warning to the QA team member that failed to catch the use of an incorrect ingredient on 8-7. This mistake caused a product to be downgraded. The write up was not issued. I had to do it myself on 8-24.
- During an investigation we found out that metal detection records were not being documented properly in PlantView. While discussing the issue with Jan and Wonda, I asked Wonda to have the techs stop recording metal detection checks in PlantView and to record them on paper only. A week later there was another issue with a QA member and metal detection and during that investigation we discovered the same documentation issue with metal detection checks in PlantView. When I asked Wonda why they were still entering them in PlantView, she stated that she thought I intended to only stop recording one specific metal detection check in PlantView. I asked her again to make sure that no metal detection checks were entered into PlantView and that all of them were paper only.
  - During both conversations, I explained the reason. Metal detection checks are time sensitive and require for the actual time of the check to be recorded. This is not currently possible in Blountsville due to lack of equipment. In order to have PlantView record the start and end time of the checks we will need to have several handheld/portable PlantView units.
- Wonda had failed to issue a single attendance notification to one of her 2nd shift techs. This tech had acquired 2 unexcused and several excused points. Management support attendance policy defines termination at 2 unexcused points. I issued this tech a final attendance notification on 8-24.
- On 8-14, Wonda left the facility to travel to Cullman to have her annual hearing exam. She did not notify me that she was leaving the grounds.

(PX 26). Ennis did not receive a written warning for these issues; White addressed these issues with her informally.

On September 9, 2009, White communicated with Ennis that she needed to call each location listed on an email, request that the location release product to a new

hold status, and save the release in a folder on her computer.  (PX 26).  Ennis

improperly sent the release notice not to the locations where the product was located,

but back to the individual who had requested the release of the product.  (PX 26).

When White addressed this issue with Ennis, she informed him that she

misunderstood his instruction.  (PX 26).  Ennis testified that she understood what

White wanted, she just "didn't know how to go about it."  (Pl. Dep. at 245).  Ennis

was not issued a written warning; White addressed this issue with Ennis informally.

During this time period, there were several job openings in QA on Ennis's shift

that needed to be filled, which was making it challenging for Ennis's shift to

complete all required QA functions.  (Pl. Dep. at 229).  On September 4, 2009, White

emailed Ennis and instructed her to give the individuals bidding on the QA jobs on

her shift the practice test that night.  (PX 26).   White followed up with Ennis each

week thereafter and, as of September 28, 2009, Ennis still had not distributed the

practice tests or scheduled the interviews.  (Exh. 24 to Pl. Dep.).  Ennis received her

first written warning on September 28, 2009 for this infraction.  (Exh. 24 to Pl. Dep.).

Although White had discretion to either issue Ennis the written warning or a lesser

discipline, he chose the written warning, fully aware of Tyson's policy that four

written warnings would result in a termination.  (White Dep. at 319).

On September 30, 2009, White conducted Ennis's performance review for the

period covering October 2008 through September 2009.  (Exh. 29 to Pl. Dep.). Because White had only been Ennis's supervisor for a little over a month, and Ennis's former supervisor no longer worked at Tyson, White sought input from Chang and Cannon (who had previously filled in as interim QA Manager).  (Pl. Dep. at 252-253). Jan Casey, the HR Manager, had expected White to look at the previous manager's evaluations to complete his evaluation.  (Casey Dep. at 133; Casey Decl., ¶ 2).

As part of the review, White evaluated Ennis on the goals that Trujillo had set for her the year before, including the goal set in September 2008 that Ennis become proficient in PlantView.  (Pl. Dep. at 268).  Ennis admits that at the time she received the "Does Not Meet Expectations" rating, she was not proficient in PlantView, even though she had worked with the program for over a year and had been sent to a two day training class.  (Pl. Dep. at 261).  In the review, White set goals for Ennis which Ennis admits were appropriate, measurable, objective, and achievable.  (Pl. Dep. at 266, 270).

On November 4, 2009, the Plant Manager emailed Ennis regarding issues with QA carts not being cleaned and put up each night after the second shift.  (PX 26). The Plant Manager informed Ennis that the plant had received a negative rating because of this issue and reminded Ennis that "the issue has been communicated to you I know."  (PX 26).  The Plant Manager also informed Ennis that the Assistant

Plant Manager had spoken with her QA Techs directly about the issue. (PX 26). The Plant Manager told Ennis, "I am expecting you to make sure this situation is corrected immediately and I do not want to cover this issue again, it is very simple to solve. If there is an issue I am unaware of please let me know. Otherwise please get this task accomplished." (PX 26). Ennis did not receive any written discipline on this issue. But on November 29, 2009, White emailed Ennis informing her that her oil cups and supplies were dirty when he arrived at the plant that morning. (PX 26). Ennis did not receive any written warning for this issue.

In November 2009, when Ennis was out due to illness, another employee found a foreign material investigation report from October 2009 in her desk. (Pl. Dep. at 290). A foreign material investigation report is usually filled out by production supervisors when there is an issue regarding possible foreign material contamination of a product. (Pl. Dep. at 293). The report is given to the QA Supervisor who should then conduct an investigation and turn the report in to upper level plant management. (Pl. Dep. at 293). Plaintiff testified about the report discovered in her office:

Q:    But am I right that you did not turn in the incident report from October 12th?

A:    They said it was in a personal drawer in a file. I did not know it was in

there; and while I was gone, they got into my personal drawer and they

said they found it there.

Q:    Was it something that you should have turned in?

A:    Yes.

(Pl. Dep. at 290-291).  Ennis testified that she understood that it was a serious issue

and why she was held responsible:

Q:    Can you recognize that if a supervisor finds a foreign material

investigation report in somebody's desk drawer that should have been

turned in, that that's a serious problem?

A:    Yes.

Q:    And can you recognize why they would think that you knew about it?

A:    It was in my drawer.

(Pl. Dep. at 296).

When Ennis and White returned from holiday vacation, White issued Ennis her

second written warning for this incident despite the fact that White was not present

when the document was found.  (Exh. 23 to Pl. Dep.; *see also* White Dep. at 323,

337).

On December 8, 2009, White was informed that there was an issue with

product that had been released from hold by a production worker (second shift lead)

on Ennis's shift.  (Exh. 26 to Pl. Dep.).  White also learned that the second shift had written documentation on the back of hold tags and that Ennis did not know anything about the hold being released, when this is a function that Ennis should be managing.  (Exh. 26 to Pl. Dep.).  White emailed Ennis instructing her to make sure QA Techs know that they are responsible for the tags and all of the information that is to be recorded on the tags.  (Exh. 26 to Pl. Dep.).  White also instructed Ennis that "QA needs to verify what is being done, it's effectiveness and document it.  Explain [to the QA Techs] what is expected, how to do it and hold folks accountable."  (Exh. 26 to Pl. Dep.).  Ennis did not receive any written discipline for this issue.

On December 28, 2009 Ennis wrote an email to White seeking guidance "moving from technician to supervisor."  (Def. Exh. 30 to Pl. Dep.; Pl. Dep. at 300-302).  Ennis asked White to "help me make a list of what you want me to do each night or what you expect of me, just something."  (Def. Exh. 30 to Pl. Dep.).  Ennis told White that she was "not going to make any excuses" and "should have known by now not to let my personal judgment get in the way of my professional ones.  I am just being myself and I have realized that I must be more professional."  (Def. Exh. 30 to Pl. Dep.).  Ennis further stated: "I am willing to do whatever it takes.  I take my job very seriously.  I am not a lazy person, I have always tried to do my job right."  White did not respond in writing to the email, but told Ennis that he thought it was

20

in her best interest to step down from the supervisor position.  (Pl. Dep. at 313). Ennis was insulted by that response and rejected the offer of stepping down.  (Pl. Dep. at 314).

On January 6, 2010, White learned that Ennis had failed to send a required feather summary report that was due on a weekly basis.  (PX 26).  Ennis responded: "I just forgot no other excuse.  Matt [Crowe] and I got working on the [PlantView] Query and just forgot."  (PX 26).  White did not issue any written discipline to Ennis for forgetting to send the required report.

However, on January 7, 2010, White issued Ennis her third disciplinary warning.  (PX 4; Pl. Dep. at 298).  This warning stated: "On 1-6-10 you QA data verified several checks in PlantView as correct.  These checks contained data errors that should have been corrected prior to completing the verification."  (PX 4).  Ennis testified that this error did not have the usual alarm to alert her to the fact that there was an error, so she skimmed through it instead of checking for all data errors.  (Pl. Dep. at 298).  Both Ennis and the QA Tech who actually committed the error were written up for the error.[6]  (White Dep. at 308).

---

[6] Brandy Woods, the employee who built the report and also did not catch the error, was not written up for this incident.  Brandy Woods is thirty years old.  (White Dep. at 308).

On the day of the incident, White sent his supervisor, Vivian Chang, an email which clearly stated that all three employees were involved in the report and none of them caught the error.  (White Dep. at 313).  White provided no rationale for his failure to discipline Woods other than it was his "discretion" to do so.  (White Dep. at 313).

On or about January 10, 2010, Ennis spoke with White about stepping back down to the QA Tech job, a job in which she had performed well. (Pl. Dep. at 313-314). Ennis told White that she would think about it, but then decided against it. (Pl. Dep. at 313-314). Eight days later, on January 15, 2010, White responded to Ennis's email of December 28, 2009 with a formal Memorandum. "Over the next 60 days you are expected to improve on several aspects of your department, and develop an action plan to continue to improve on all aspects of your responsibility." (Def. Exh. 31 to Pl. Dep.). White met with Ennis and instructed her that she was "expected to review all PlantView data for 2nd shift before leaving for the night so that reports can be pulled the next morning. This data must be error free and any errors corrected prior to leaving for the day. This information is provided to our customer." (Exh. 31 to Pl. Dep.). Finally, White directs Ennis that "[a]s the QA Supervisor you will be held responsible for your actions and the performance of your team." (Exh. 31 to Pl. Dep.). Although Ennis described the January 15 meeting as positive, she did not feel as if White gave her enough guidance on how to achieve her goals. (Pl. Dep. at 316).

Just a few days into the 60 day developmental plan, on January 26, 2010, Ennis received a call from White who was in Atlanta in a meeting with Wendy's upper-level management and Tyson QA executives. (Pl. Dep. at 322). While at the meeting, Wendy's requested some QA data so that a decision could be made regarding the

product at the meeting.  (Pl. Dep. at 322).  Ennis was unable to provide the

information as needed and testified about the incident as follows:

> Q:     Was it wrong for Jason to call and ask his QA supervisor to provide the
>
>        data that he needed at the meeting?
>
> A:     No.  But what was wrong was him not trying to explain it where I could
>
>        get it to him.  He could have stayed calm and – I'm not dumb.  I could
>
>        have went through it.
>
> Q:     Why do you think he was not calm?
>
> A:     Because he wanted it right then.
>
> Q:     Why do you think he wanted it right then?
>
> A:     Because he needed it right then.
>
> Q:     Yes.  Because he was sitting there with his bosses and all the Wendy's
>
>        upper management, and they wanted it then, right?
>
> A:     Right.

(Pl. Dep. at 329-330).

Ennis testified that at first she had a computer issue, but then she was able to

access the data but still did not cut and paste the data correctly into the report as

needed:

> Q:     But then you got [the computer] to work and you were able to highlight,

cut and paste?

A:      What I found, yes.

Q:      But it wasn't right, was it?

A:      Right.

Q:      And that was your inability to do it, right?

A:      For untrained, yes.

Q:      Your testimony is you were never trained how to highlight, cut, and

paste out of PlantView into a spreadsheet; is that your testimony?

A:      What I'm saying is, you had to go to another area, get it out of the data,

then you had to look up the dates and all that, which I was not trained

for, because that's what he told me Matthew and Brandy would do, was

put that in there so you could bring it over to the report.  And I asked for

training.  I asked Brandy to help me more than once.

(Pl. Dep. at 331).  In the end, White had to stall with the Wendy's executives, borrow

a computer from someone else who was at the meeting, and cut and paste the needed

data himself:[7]

_____

[7] Vivian Chang, White's boss who was also present at the meeting, testified that Wendy's
does not like the PlantView system and has suggested that Tyson should use a better computerized
system, so when the system did not work correctly in the meeting, it caused embarrassment for
White.  (Chang Dep. at 167).  According to Chang, this was a "bad meeting" generally, not solely
because of Ennis's failure to retrieve the requested data.  (Chang Dep. at 143).

24

Q:    And then did he have to find another way to get the data that Wendy's

       upper management and Tyson upper management needed right then?

A:    Yes.

Q:    He could not rely on you to get it for him; is that right?

A:    Correct.

(Pl. Dep. at 331-332; White Dep. at 364).

Ennis was issued her final Disciplinary Action Form by White on January 28, 2010 as a result of this incident.  (White Dep. at 408).  Attached to the Disciplinary Form was a memo written by White stating: "In 2009 you received training in PlantView administration and thus should have had no issues with pulling data."[8] (PX 6).  White testified that he understood that Ennis had asked him for help with the PlantView system prior to this incident, and acknowledged that he knew Ennis was struggling with the program when he called her from the meeting and asked her to pull the information.[9]  (White Dep. at 358).

_____

[8] Despite White's allegation in the memo that he walked her through the steps, Ennis disputes this account and testified that White did not walk her through the steps.  (Pl. Dep. at 327).

[9] According to Jan Casey of Human Resources, it took some employees longer than others to understand the PlantView system.  (Casey Dep. at 65).  Casey testified that she instructed managers to never write someone up the first time on PlantView because of the problems employees were having.  (Casey Dep. at 58).  Casey acknowledged that it is common to retrain employees on various topics and that she is "not going to give up on anybody" and if someone is asking for training they ought to be given the training.  (Casey Dep. at 67-68).  Casey expected management to consider whether an employee had been given additional training after a request before writing the employee up.  (Casey Dep. at 68-69).

After Ennis received this fourth warning, her employment was terminated by White.  Vicky Craig, Human Resources Clerk, testified that White notified her that he had given Ennis her fourth write-up and that her employment needed to be terminated.  (Craig Dep. at 92-93).  White has never terminated anyone else in his tenure had Blountsville and Ennis was the oldest member of management.  (Casey Dep. at 110).  Ennis was replaced by Sherry Bell, a younger employee that White hired.  (Casey Dep. at 301-302).

Ennis filed for unemployment compensation benefits with the Alabama Department of Industrial Relations and was awarded benefits.  (PX 25).

## IV.   Analysis

### A.   Count One – Disability Discrimination

Count One of the Complaint alleges disability discrimination under the Americans with Disabilities Act.  However, in footnote 1 of her Brief (Doc. #37) in Opposition to Defendant's Motion for Summary Judgment, Plaintiff notes that she has "determined she cannot meet the burdens established by the ADA and concedes this claim."  (Doc. #37 at 1, n.1).  Therefore, Count One of the Complaint is due to be dismissed in its entirety.

**B.      Count Two – Discrimination Because of Age**

**1.      Overview of the ADEA and Burden Shifting Analysis**

Count Two of the Complaint alleges that Plaintiff Ennis has been discriminated against on the basis of her age.  (*See generally* Doc. #1, Count Two).  The Age Discrimination in Employment Act provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  To fall under the protections of the ADEA, an employee must be "at least 40 years of age." 29 U.S.C. § 631(a).  The Eleventh Circuit uses the framework established in *McDonnell Douglas* and *Burdine* to evaluate ADEA claims that are based upon circumstantial evidence of discrimination.[10]   *See Thomas v. Humana Health Plan, Inc.*, 457 Fed. Appx. 819 (11th Cir. 2012); *see also Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 n. 6 (11th Cir. 2001) ("Although the *McDonnell Douglas* framework originally applied in Title VII cases, it is now widely accepted that the framework applies to claims of discrimination under the ADEA as well.").

Under the *McDonnell Douglas* framework, the plaintiff first has the burden of

---

[10] Plaintiff concedes that she has no direct evidence of age discrimination and agrees that the *McDonnell Douglas* framework applies to her claim.  (*See* Doc. #37 at 18).

27

establishing a prima facie case of age discrimination by showing that she is: (1) a member of a protected class; (2) qualified for her current position; (3) subject to an adverse employment action; and (4) treated less favorably than a similarly-situated employee outside her protected group. *See Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[11]  *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254-55; *see Chapman*, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination fails and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[12]  Where the defendant articulates

---

[11] *See Chapman*, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[12] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Simply quarreling with that reason is not sufficient. *Chapman*, 229 F.3d at 1030.

multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons. *See Chapman*, 229 F.3d at 1024-25.

At all times during this analysis, when a plaintiff alleges disparate treatment such as termination of employment, liability depends on whether the plaintiff's age actually motivated the employer's decision. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Accordingly, the age of the plaintiff must have actually played a role in the employer's decision making process and had a determinative influence on the outcome. *See Bray v. Paetec Communications,* Slip Copy, (Jan. 9, 2014) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)).

## 2.   Legitimate Non-Discriminatory Reasons and Pretext

Defendant Tyson has conceded, for purposes of summary judgment, that Plaintiff can establish the prima facie case of age discrimination. (*See* Doc. #32 at 26) ("Defendants will assume *arguendo*, and for purposes of summary judgment only, that Plaintiff has established a *prima facie* case."). Tyson has articulated a legitimate, non-discriminatory reason for the termination of Ennis's employment – "her poor job performance that resulted in four written warnings in a 12 month time period." (Doc. #32 at 26). Therefore, to avoid summary judgment, the burden shifts back to Plaintiff to "present evidence that [the employer's] legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1531 (11th

Cir. 1997) (citations omitted).  That is, Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's legitimate reasons that a reasonable factfinder could find unworthy of credence." *Combs*, 106 F.3d at 1538.

Ennis focuses her pretext argument in relation to each of the four specific warnings issued in a twelve-month time period because "if any one of these disciplinary actions was invalid, Plaintiff would not have been terminated."  (Doc. #37 at 20, 24) ("For each of the warnings issued to Plaintiff, there is substantial evidence of pretext.  A genuine issue of material fact exists as to the pretextual nature of each proffered reason for Plaintiff's discipline.").  She asserts that Jason White, her immediate supervisor who issued the disciplines, "was on a mission" to fire her because of her age.  (*See* Doc. #37 at 20).

Each of the pretext arguments for each of the warnings is considered in turn.

### a.       September 28, 2009 Warning

On September 28, 2009, White gave Plaintiff a written warning for failing to distribute practice tests and schedule testing interviews for two open shift positions.  (PX 2; *see also* discussion *supra* Section III.E).  Ennis believes that this written warning was a pretext for discrimination because: (1) at the time White told Plaintiff to schedule practice tests and interviews, an audit was occurring in the QA

Department, which was stressful for QA employees; and (2) White did not issue Ennis a counseling for this error, as required by Tyson policy, but instead wrote Ennis up formally. (*See* Doc. #37 at 21). Tyson counters that Ennis does not dispute that she failed to perform this duty as instructed, nor does she dispute White's testimony that he repeatedly instructed her to accomplish this task. (*See* Doc. #38 at 7). White testified that Plaintiff's failure to schedule the tests "warranted a written warning [as opposed to a counseling] due to the number of times that I had asked Wonda to complete this task." (White Dep. at 317).

Plaintiff's belief that she should not have been issued a formal written warning for this infraction because it occurred during a stressful time in the QA Department does not establish pretext. It is well settled that a plaintiff cannot establish pretext by substituting her business judgment for that of the employer. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. That is, whether or not Ennis actually "deserved," in her opinion, this written warning, "is irrelevant to the pretext question." *Frazier v. Doosan Infracore Intern., Inc.*, 479 Fed. Appx. 925, 934 (11th Cir. June 26, 2012). The court is not to analyze "whether employment decisions are

prudent or fair." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  The relevant question is whether White's dissatisfaction with [Ennis's] performance was actually a cover for discrimination.  *See id.* at 934; *see also Bray v. Paetec Communications, Inc.*, Slip Copy, at *5 (Jan. 9, 2014) ("[Plaintiff's] failure to comply with job expectations gave [the supervisor] a reasonable basis [for disciplining Plaintiff]. . . . [disciplining Plaintiff] was not an antagonistic or unreasonable action . . .").

The alleged failure of Tyson to follow policy on issuing a counseling before a written warning does not help Ennis leap that hurdle.  As supervisor, White made clear during the course of his deposition that Tyson management had discretion whether to follow the policy on issuing a counseling before issuing a written warning. (White Dep. at ).  Jan Casey, a Tyson Complex Human Resources Manager, testified that there are categories of discipline and that the Blountsville policy is not read as if requiring certain steps such as verbal counseling prior to a written warning.  (Casey Dep. at 231-233; *see also* Craig Dep. at 109-110 ("[S]ometimes they don't do a counseling . . .").  And "if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext." *Parrott v. PNC Bank, Nat. Ass'n*, – F. Supp.2d – (N.D. Ala. 2013) (quoting *Ritchie v. Indus. Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011).

For the foregoing reasons, Plaintiff has not shown pretext for the written warning that was issued to her on September 28, 2009.

### b.     December 11, 2009 Warning

On December 11, 2009, White again issued Ennis a written warning.  (PX 3; *see also* discussion *supra* Section III.E).  This warning states that Ennis "failed to turn in a foreign material investigation in a timely manner.  The report was for an incident on October 12 and was found in her desk drawer in the middle of November."  (PX 3).  Ennis believes that this written warning was a pretext for discrimination because: (1) White did not document the incident, did not investigate the incident, and could provide no information or documentation as to who found this alleged report or when or where it was found; (2) Plaintiff was not at work on the day the report was found in her desk and Tyson can provide no documentation as to any basis for the discipline.  (*See* Doc. #37 at 21-22).

But Plaintiff's belief that someone "planted" the report in her desk is an unsupported, speculative belief.  White testified that he investigated the facts primarily by questioning Ennis about the report.  (*See* White Dep. at 325, 330, 337).  He decided to discipline Ennis for the incident by issuing her the written warning, even though he could have done less than write her up.  (*See* White Dep. at 326).  Once again, White decided to exercise his discretion by issuing the written warning.

This business judgment may not have been wise considering the sparse information gleaned during the investigation, but as a business decision it is outside the purview of the court. *See Parrott v. PNC Bank, Nat. Ass'n*, – F. Supp.2d – (N.D. Ala. 2013) (quoting *Ritchie v. Indus. Steel, Inc.*, 426 Fed. Appx. 867, 873 (11th Cir. 2011); *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). White was clearly displeased with Ennis's performance and Ennis herself testified that the report should have been turned in, that failing to do so was a serious problem, and that she understood why White reached the conclusion that Ennis was at fault. (Pl. Dep. at 296). Despite the fact that Ennis maintains her innocence, "it is irrelevant. [She] must, instead, produce evidence demonstrating that [White] did not in good faith believe that allegations, but relied on them in bad faith pretext to discriminate against [her] because of [her] age." *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993). There is no evidence that White did not actually believe that the failure to turn in the report was Ennis's deficiency, nor that he wrote her up for this infraction because of her age. *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

For the foregoing reasons, Plaintiff has not shown pretext for the written warning that was issued to her on December 11, 2009.

### c.     January 7, 2010 Warning

On January 7, 2010, White issued a third formal discipline to Ennis.  Ennis had verified certain data entered into the PlantView data system without actually checking that data.  (PX 4).  "These checks contained data errors that should have been corrected prior to completing the verification."  (PX 4).  Jeff Nichols, who was in his forties but thirteen years younger than Ennis, was also disciplined for this error[13] but Brandy Woods, age thirty and a production supervisor, was not disciplined.  (*See* Doc. #37 at 22).  Plaintiff argues that "[t]he difference in treatment Plaintiff received from that of [younger] Woods is compelling evidence of age discrimination."  (Doc. #37 at 23).

The problem with Plaintiff's pretext argument is that she was the QA Supervisor ultimately responsible for this data being accurate.  As such, she was required to perform data checks and verify that certain data entered into the PlantView system was accurate – no one else held that responsibility.[14]  To that end, Ennis certified that data was accurate, but admittedly just "skimmed" through it and automatically verified it as correct.  (Pl. Dep. at 298).  The clearly inaccurate report caused upper management to question "[h]ow in the world does a check get

---

[13] Jeff Nichols was the QA Tech that first entered the data incorrectly.

[14] At the time of this error, Ennis had been performing PlantView verifications for at least six months.  (Pl. Dep. at 524).

completed like this and no one notice, much less send it to the customer?" (PX 26).

Ennis's error cannot properly be compared to the error made by Brandy Woods.

Woods merely "built the report and sent it without catching it."[15]  (White Dep. at

310).  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("To make a

comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff

---

[15] Ennis makes much of the fact that Brandy Woods was not terminated for what Plaintiff believes to be a more serious infraction than Plaintiff's. (*see* Doc. #37 at 15-17). The infraction, while not to be undermined as to its importance, was wholly different than the infractions which caused Ennis to be written up and ultimately terminated.

In March 2011, White sent Woods to Arkansas for Tyson training. (White Dep. at 225). For her business trip, Woods rented a car with a drivers' license that had been suspended. (PX 18; Casey Dep., Exh. Bates labeled 01860). Although Plaintiff contends that Woods "should have known" that her license was suspended (*see* Doc. #37 at 15, n.7), Woods wrote a statement that she did not know that her license remained suspended because "I had paid everything they told me to pay so I thought I was ok and had my license back." (Casey Dep., Exh. Bates labeled 01860).

Driving on the suspended license on her work trip, Woods was pulled over for reckless driving and the rental vehicle was impounded. (Casey Dep., Exh. Bates labeled 01868). Woods contacted White after the vehicle was impounded and told him that everything would be taken care of with the Tyson Travel Department and the rental company. (Casey Dep., Exh. Bates labeled 01868; White Dep. at 250).  Woods subsequently turned in a mileage voucher to Tyson for reimbursement (since she resumed the trip using her personal car), but also submitted paperwork for Tyson to pay for the rental car that had been impounded. (White Dep. at 255, 257). Woods also requested expense money for her trip in addition to having Tyson billed directly for her hotel expenses. (*See* Woods Dep. at 36-38; *see also* Casey Dep. at 329, 331).

In response to this incident, Woods was suspended for five days and given a final written warning for the misconduct. Woods understood that any additional misconduct would result in her termination. (Woods Dep. at 97). White had no involvement in the decision on the discipline that Woods received for this incident. (White Dep. at 517).

Although Woods' level of discipline may not have been sufficient in Ennis's mind, there is no dispute that White was not involved in determining the level of discipline to be issued to Woods for this incident. In fact, White was disciplined for not inquiring more into the situation when it occurred. (Casey Dep. at 342-343). Therefore, no inference can be drawn in an attempt to compare White's disciplines of Ennis compared to that of Woods. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("[D]ifferences in treatment by different supervisors or decision makers can seldom be a basis for a viable claim of discrimination.").

must show that he and the employees are similarly situated in all relevant respects.").

She did not verify, with her signature, the data in the PlantView system as accurate.

For the foregoing reasons, Plaintiff has not shown pretext for the written

warning that was issued to her on January 7, 2010.

### d.    January 28, 2010 Warning

Ennis received a fourth and final written warning when she was unable to

respond to a query for customer data from White.  (Pl. Dep. at 507; *see also* PX 5, 6).

Plaintiff believes that this write-up was a pretext for age discrimination because: (1)

White knew that Ennis was struggling with PlantView when he called her and asked

her to pull up the information; (2) White had provided Ennis with no additional

training on PlantView, despite her request for it and management's willingness to

give additional training on the system; and (3) many employees had a hard time with

PlantView and even certain customers wanted Tyson to use a better system.  (*See*

Doc. #37 at 23-24).

The fact that the system was difficult, not entirely user-friendly, and that many

struggled with it does not negate the fact that Ennis can point to no other QA

Supervisor who was unable to perform the function in PlantView that was required.

(Pl. Dep. at 507, 509).  White was embarrassed and frustrated by Ennis's inability to

retrieve the data (White Dep. at 475), and was within his purview to discipline Ennis

37

for failing to perform up to her job expectations. *Bray v. Paetec Communications, Inc.*, Slip Copy, at *5 (Jan. 9, 2014) ("[Plaintiff's] failure to comply with job expectations gave [the supervisor] a reasonable basis [for disciplining Plaintiff]. . . [disciplining Plaintiff] was not an antagonistic or unreasonable action . . ."). Ennis readily admits that she was unable to glean the information as requested by White, despite the fact that she had two days of formal training on the system and had access to the administrative manual, on-line training, and technical support. (Pl. Dep. at 46; White Dep. at 368-369). Whether it was wise or prudent for White to issue Ennis this final discipline without first allowing her additional training on PlantView is not for this court to decide. Ennis could not perform her job in accordance with the company's expectations, and that is why she was issued the final written warning that led to her termination with the company.

For the foregoing reasons, Plaintiff has not shown pretext for the written warning that was issued to her on January 28, 2010.

## IV.   Conclusion

Jason White may have been "on a mission" to terminate Ennis's employment with Tyson, but there is no evidence that such purported mission was due to anything other that Ennis's performance issues. Therefore, Defendant's Motion (Doc. #29) for Summary Judgment is **GRANTED**. A separate order will be entered dismissing all

claims against defendant Tyson Foods, Inc.

**DONE** this the ___31st___ day of March, 2014.

_____

SENIOR UNITED STATES DISTRICT JUDGE